UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARRIE ANN BIGELOW,

        Plaintiff,                   Case No. 2:14-cv-14416
                                   District Judge Arthur J. Tarnow
v.                                Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 13) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 12)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.**    **REPORT**

       Plaintiff, Carrie Anne Bigelow, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her applications for disability insurance

benefits and supplemental security income. This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's motion for

summary judgment (DE 12), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 13), Plaintiff's reply (DE 14), and the administrative record (DE 8).

### A.   Background

Plaintiff protectively filed her applications for benefits on August 4, 2011, alleging that she has been disabled since April 22, 2008.  (R. at 215-232.)[1] Plaintiff's applications were denied and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Timothy Scallen held two hearings: one on November 29, 2012 and the second on May 29, 2013.  (R. at 34-101.)   He subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 17-27.)   On September 20, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Scallen's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

---

[1] Plaintiff alleged an onset date of April 2008 in prior applications that were denied in July 2009. She did not appeal those decisions.  The ALJ therefore limited the instant decision to the period after July 15, 2009, and Plaintiff does not appear to dispute this timeline.  (R. at 22.)

### B.      Plaintiff's Medical History

Plaintiff's medical record is extensive, dating back to 2005 when she was exposed to human parvovirus.  (R. at 579.)[2]  During the time period at issue in this case, she was frequently treated by Andrew Biondo, D.O., at the Henry Ford Health System.  She complained of a "left facial droop" in 2009 and was admitted to the hospital for a possible stroke.  (R. at 581.)  All objective reports were negative, but soon after she developed fatigue, lightheadedness, numbness, and tingling.  (R. at 582.)  Dr. Biondo noted that the facial droop remained, but seemed to be improved by rubbing her mandibular region.  (Id.)  He further noted her right-sided weakness and migraines.  (R. at 582-84.)

On June 30, 2009, she had a normal physical examination, with a negative straight leg raise test.  (R. at 588.)  She reported improvement with epidural injections.  (R. at 591.)  Plaintiff underwent an MRI of the brain and neck on June 1, 2010 which was unremarkable.  (R. at 628-29.)  She was admitted to Henry Ford Hospital on June 1, 2010 with complaints of facial asymmetry and was discharged on June 3, 2010.  (R. at 636.)

---

[2] Parvovirus is an infection spread through "respiratory secretions," blood, or blood products.  It can cause wide-ranging symptoms and concurrent conditions, such as rash, painful or swollen joints, and anemia. Centers for Disease Control, *About Parvovirus B19*, http://www.cdc.gov/parvovirusb19/about-parvovirus.html (last visited January 4, 2016).

On January 18, 2011, Dr. Biondo noted that Plaintiff's headaches were under better control with Inderal and Imitrex. (R. at 906.) She underwent physical therapy from February 15, 2011 through May 10, 2011, but was discharged when she did not contact the provider for follow-up. (R. at 702.) On March 18, 2011, her strength had increased significantly and she reported improvement with overhead reaching and ambulation. (R. at 716.) A March 8, 2011 MRI revealed relatively normal findings. (R. at 893.) Her October 13, 2011 lab results were normal. (R. at 620.) On October 12, 2012, Dr. Biondo started Plaintiff on methotrexate to deal with her unspecified autoimmune problems. (R. at 622.)

Dr. Biondo completed an RFC assessment on October 5, 2012. (R. at 1067-1072.) He indicated that Plaintiff could lift/carry up to twenty pounds occasionally, sit up to two hours at a time and eight hours total in the course of a workday, and stand/walk one hour at a time and three hours in the course of a workday. (R. at 1067-68.) However, Dr. Biondo amended those estimates "after discussing with [his] patient," and limited her to sitting for thirty minutes, standing for twenty minutes, and walking for twenty minutes. (R. at 1074.)

R. Qadir, M.D., completed a consultative examination on December 21, 2012. (R. at 1132-1135.) The physical examination of Plaintiff was normal. (R. at 1133.) Dr. Qadir noted that Plaintiff could lift/ carry twenty pounds

occasionally and ten pounds frequently, sit for three hours at a time and six hours in the course of a workday, and stand/walk for one hour at a time.  (R. at 1136-37.)

Plaintiff also asserts that she suffers from mental health impairments, including depression and anxiety.  Michael Matouk, M.A., L.L.P., performed a psychological evaluation on January 3, 2012.  (R. at 908-912.)  Plaintiff reported that she suffered from pain, fatigue, facial droop, and anxiety and depression because "excessive worrying about her condition makes her sad."  (R. at 908.).  Mr. Matouk summarized her mental health history, which consisted of therapy lasting "a couple of months" in June 2011.  (Id.)  He diagnosed her with adjustment disorder with mixed anxiety and depressed mood.  (R. at 912.)

Limited Licensed Psychologist Beverly Hartman assessed Plaintiff on September 18, 2012.  (R. at 964-966.)  She concluded that Plaintiff was markedly restricted in her ability to make judgments on simple work-related decisions and to carry out complex instructions, noting that Plaintiff's physical limitations could limit her abilities in these areas.  (R. at 964.)  She further noted that she was "not a medical doctor, so I can only go by clients' report of chronic pain."  (R. at 965.)

C.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

a.    **November 29, 2012 Hearing**

At the November 29, 2012 administrative hearing, Plaintiff testified that that she was a 40-year old high school graduate, who was certified as an EMS.  (R. at 37.)  She lived with her husband and described her normal lifestyle as "very sedentary;" noting that she slept at least twelve hours per night and went to bed as early as 6:30 P.M.  (R. at 46.)  During a normal day, she woke up at 11:00 A.M., made something to eat, took her medications, used the computer, drove to pick her son up from school, and attempted to put a meal together.  (R. at 47.)  Plaintiff testified that she did not help with dishes or cleaning.  (R. at 48.)  She further noted that she did not need help with personal care.  (R. at 57.)

Plaintiff last worked in June of 2011 as a veterinary receptionist.  (R. at 38.)  She testified that the most she carried at this position was ten pounds.  (R. at 39.)  She stopped working at this position because her medical problems worsened.  (R. at 40.)

Plaintiff testified to "systemic pain" that rated a five to seven out of ten daily.  (R. at 40.)  She took medication for the pain, such as hydrocodone and Vicodin, but tried to avoid them for fear of addiction.  (R. at 41.)  According to Plaintiff, she only took the pain medication at night during a "stable" day, but took

it more often when she experienced a "flare," which involved a headache and increase in pain. (R. at 41-42.) Plaintiff testified that flares occurred more often when she took part in more strenuous activities, such as grocery shopping and standing for long periods. (R. at 42.) Plaintiff noted that during a flare she would either take pain medication or "work through it." (R. at 43.) She testified that she experienced lightheadedness and constipation as side effects of the medicine. Plaintiff testified to having Raynaud's which causes her hands and feet to be cold, numb, and tingly. (R. at 43.)

Plaintiff testified to suffering from migraine headaches, occurring once or twice per month. (R. at 44.) She indicated that, at their worst, the pain from the headaches is nine to ten out of ten. (R. at 45.) Plaintiff noted that she took Imitrex and would lay down when she gets a headache. (Id.)

Plaintiff testified to having two herniated discs in her lower back, which caused her pain. (R. at 45.) She indicated that the pain causes right-sided weakness, which affected her ability to walk and grip. (R. at 49.) In addition, she noted the presence of pain running up and down her arms. (R. at 40.)

Plaintiff testified to problems with anxiety and depression, for which she took the medicine Buspar. (R. at 50.) She also noted infrequent panic attacks, which were brought on by overwhelming situations. (R. at 51.) She also described

cognitive issues, such as feeling "foggy" and having difficulty with short-term memory.  (R. at 58.)

Plaintiff indicated that she could lift and carry up to ten pounds, sit for twenty minutes, and stand for fifteen minutes.  (R. at 52-53.)  She testified that she could walk very short distances and did not drive for longer than 45 miles.  (R. at 54 and 58.)  She noted that her ability to reach was intact, but she did not kneel, stoop, crouch, or crawl.  (R. at 55.)  Because of her right-sided weakness, however, she sometimes dropped items and struggled with buttons.  (R. at 56.)

### b.      May 29, 2013 Hearing

Plaintiff testified that, since the previous hearing, her stomach issues had stabilized other than frequent constipation.  (R. at 69.)  She reiterated that her hands and feet were cold constantly because of Raynaud's syndrome.  (R. at 71.) She noted, however that her feet got "really hot" at around 11:30 at night.  (R. at 72.)

Plaintiff testified that she had lost weight over the past year because she participated in a weight management program.  (R. at 72-73.)  The program focused on diet because exercise exacerbated her pain and facial droop.  (R. at 73-74.)

Plaintiff indicated that on a normal day her pain level was six to seven out of ten and felt like she was "bruised all over."  (R. at 74.)  When she had flare-ups,

8

however, she indicated that the pain was a nine or ten out of ten.  (R. at 74.)  She

testified that she had about fourteen flare ups per month and was in bed about half

of the month.  (R. at 75.)  Plaintiff again mentioned the herniated discs and noted

that she could sit comfortably for twenty minutes and stand for ten to twenty

minutes.  (R. at 82.)  She slept with a brace on her right leg to stretch the muscles

and assist with the range of motion in her ankle.  (R. at 77.)  Plaintiff estimated that

she had five or more doctors' appointments per month.  (R. at 89.)

Plaintiff noted that she had been ill since the last hearing because of her

immunosuppressive medication.  (R. at 78.)  She tried to avoid large crowds and

family gatherings where people had been sick.  (R. at 78.)  In addition, Plaintiff

testified that the medication exacerbated her cognitive issues and caused nausea.

(R. at 79.)  Plaintiff again noted that she suffered from migraine headaches once or

twice per month.  (R. at 79.)  She took Imitrex for the headaches, but testified that

the side effects were "horrible."  (R. at 80.)

Plaintiff provided an update about her anxiety and depression, noting that

Buspar and therapy were helping.  (R. at 84.)  She reported feeling overwhelmed in

large crowds.  (R. at 86.)

Plaintiff testified that she went to church with her family on Sundays and sat

near the chicken coops during the day.  (R. at 81.)  She noted that the family

occasionally went out to eat at restaurants.  (R. at 85.)

Plaintiff's husband also testified at the hearing.  Mr. Bigelow noted that his wife was in "extreme pain" and spent a lot of time in bed.  (R. at 91.)  He indicated that Plaintiff's doctors were only treating her symptoms because they were unsure as to the specifics of her immune disorder.  (R. at 92.)  Mr. Bigelow testified that he did most of the household chores and noted that, in the two years they had been married, he noticed a decline in Plaintiff's well-being.  (R. at 93.)

## 2. Vocational Expert Testimony

Christian Barrett testified as the Vocational Expert ("VE") at the May 29, 2013 administrative hearing.  (R. at 96-101.)  The VE identified Plaintiff's past relevant work as: assistant manager, semi-skilled, heavy; cashier, semi-skilled, medium; catering assistant, semi-skilled, medium; client coordinator, skilled, medium; direct care worker, semi-skilled, heavy; executive assistant, semi-skilled, sedentary; home health care aide, semi-skilled, heavy; and veterinary receptionist, semi-skilled, light.  (R. at 96-97.)

The ALJ then presented a series of hypotheticals to the VE.  In the first hypothetical, the ALJ asked the VE to determine if a hypothetical individual of Plaintiff's age, education, and work experience could perform her past relevant work with the following limitations:

> [The individual] is able to perform at the light exertional level with a sit/stand option.  Also limited to the occasional climbing of stairs and ramps.  No climbing of ropes, ladders, and scaffolds.  Furthermore, limited to occasional balancing, stooping, crouching, and crawling.

10

Also, limited to avoiding all unprotected heights, concentrated exposures to vibratory tools with machinery, extreme hot and cold temperatures, dust, fumes and gases.

Furthermore limited to occasional foot controls. Also limited to simple, routine, repetitive tasks. Occasional interactions with the public.

(R. at 99.) The VE testified that the hypothetical individual could not perform Plaintiff's past relevant work. (Id.) However, according to the VE, the hypothetical individual could perform the following sedentary jobs: assembler, inspector, packager, and sorter, with 6,000 jobs in the region and 11,000 in the state. (Id.)

In his second hypothetical, the ALJ asked the VE whether the first hypothetical individual could perform the above-mentioned positions if he or she was limited to frequent or occasional handling with the right hand. The VE testified that the limitation would eliminate the bench assembly and packaging positions, which would reduce the numbers in half. (R. at 99-100.)

Finally, the VE testified that employers tolerate two fifteen-minute breaks per day, thirty minutes for lunch, and no more than fifteen unexcused absences per year. (R. at 100.) According to the VE, exceeding those limitations and being off-task for more than ten percent of a workday would be work preclusive.

## D.  THE ADMINISTRATIVE DECISION

On September 24, 2013, the ALJ issued his decision.  (R. at 17-27.)  At Step

1 of the sequential evaluation process,[2] the ALJ found that Plaintiff had not

engaged in substantially gainful activity since April 22, 2008.  (R. at 19.)

At Step 2, the ALJ found that Plaintiff had the following severe

impairments: history of autoimmune dysfunctions secondary to suspected human

Parvovirus; obesity; moderate central canal stenosis at L4-5 with mild bilateral

neural foraminal narrowing and mild right neural foraminal narrowing at L5-S1;

migraine headaches; and adjustment disorder with mixed anxiety and depressed

mood-chronic.  (R. at 19.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the  review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically, Listing 12.04.  (R. at 20.)

Between Steps 3 and 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff had the capacity to perform light work:

> [E]xcept she requires a sit/stand option; only occasional climbing of stairs and ramps; no climbing of ropes, ladders, and scaffolds; only occasional balancing, stooping, kneeling, crouching, and crawling; avoid all unprotected heights; avoid concentrated exposure to vibrating tools, moving machinery, extreme hot and cold temperatures, and dust, fumes, and gases; no more than occasional foot controls; only simple, routine, repetitive tasks; and only occasional interaction with the public.

(R. at 22.)

Relying on the VE's testimony, the ALJ determined at Step 4 that Plaintiff was unable to perform her past relevant work.  (R. at 25.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 25-26.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.

---

[3] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.  ANALYSIS

As best as the Court can discern, *with great difficulty*, Plaintiff appears to be *possibly* asserting three statements of error. In order to discern what issues Plaintiff has actually raised, the Court gratefully acknowledges the cues contained in *the Commissioner's* brief, which help to make sense of Plaintiff's otherwise confusing motion. First, Plaintiff contends that the ALJ erred in his weighing of the opinion evidence, specifically of the opinions of Ms. Hartmann and Dr. Biondo. Second, she argues that the ALJ did not include all of her limitations in his RFC. Finally, Plaintiff asserts that the ALJ erred in discounting her credibility.

The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions. I agree that the ALJ's conclusions are supported by substantial evidence and will address each argument in turn, but before I do, a few words must be addressed to the inadequacy of Plaintiff's briefing.

### 1.    The Sub-Par Quality of Plaintiff's Briefs

As Defendant points out, Plaintiff does not identify specific allegations of error in her brief. Plaintiff's brief fails to comply with several of the requirements contained in Local Rule 7.1, including the requirement that Plaintiff designate the issues presented at the beginning of her brief. E.D. Mich. LR 7.1(d)(2). The brief also fails to comply with the rule by failing to provide a page outlining the controlling authority for the relief sought. In the future, such non-complying briefs from Plaintiff's counsel will be rejected by the Court. Compliance with the Local Rules of the Eastern District of Michigan is not optional. E.D. Mich. LR 1.1(c). The Court should not be tasked with figuring out for itself what issues are on appeal. Going forward, Plaintiff's counsel is directed to: a) comply with Local Rule 7.1 by identifying all issues on which an appeal is based *at the beginning* of the brief; b) use distinct topic headings to demark each issue in the body of the brief; and, c) make sure the Statement of Issues at the beginning of the brief and the topic headings in the body conform to each other. Although it has chosen to

address the previously unidentified issues which found their way into the body of Plaintiff's brief here, going forward, the Court will not consider issues which are not identified "at the beginning" in compliance with the local rules, nor will it engage in a hunting expedition to figure out what issues are buried within the often blurry lines of the brief.

### 2.    The ALJ Did Not Err in Weighing Opinion Evidence

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants. Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  To qualify as a treating

source, the physician must have an "ongoing treatment relationship" with the

claimant.  20 C.F.R. § 404.1502.

 If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements.  Specifically, if an

ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the
> opinion, consistency of the opinion with the record as a whole, and
> the specialization of the treating source—in determining what
> weight to give the opinion.

*Wilson*, 378 F.3d at 544 (discussing 20 C.F.R. § 404.1527).  Furthermore, an ALJ

must "always give good reasons in [the ALJ's] notice of determination or decision

for the weight [the ALJ] give[s] [the claimant's] treating source's opinion."  20

C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave

to the treating source's medical opinion and the reasons for that weight."  *Friend v.*

*Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010)

(internal quotation omitted).  The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.

### a.    Ms. Hartman

Ms. Hartman, a Limited Licensed Psychologist ("LLP"), completed a medical source statement for Plaintiff on September 18, 2012. (R. at 964-966.) In the statement, she opined that Plaintiff was markedly limited in her ability to carry out simple and complex instructions. She further noted that her reasoning for assessing such impairments was based on Plaintiff's report of her physical symptoms including chronic pain, hypoglycemia, gastrointestinal disorder, and thyroid disorder. (R. at 964.) She also found marked impairments in Plaintiff's ability to respond appropriately to usual work situations, which she again based on Plaintiff's complaints of her physical impairments. (R. at 965.) The ALJ afforded little weigh to the opinion of Ms. Hartman because she had only seen Plaintiff twice and her reports were entirely based on Plaintiff's subjective report of her physical limitations. (R. at 21.) Plaintiff asserts that this was in error because the

consultative examinations by Drs. Matouk and F. Qadir support Ms. Hartman's findings.

As a preliminary matter, Ms. Hartman, an LLP, is not an acceptable medical source whose opinion is entitled to deference pursuant to 20 C.F.R. § 404.1513(a). *See also Hogston v. Comm'r of Soc. Sec.*, No. 12-12626, 2013 WL 5423781, at *9-10 (E.D. Mich. Sept. 26, 2013) (collecting cases that declined to analyze LLPs as acceptable medical sources and instead treated them as "other sources"). Furthermore, even if Ms. Hartman's opinion was an acceptable medical source, the ALJ was entitled to discount her opinion on the basis that she had only seen Plaintiff twice. *See Rogers v. Colvin*, 37 F. Supp. 3d 987, 998 (N.D. Ill. 2014) (concluding that the ALJ properly discounted a treating physician opinion where the physician had only seen the claimant twice). Additionally, the ALJ did not err in discounting Ms. Hartman's opinion because it was based on Plaintiff's subjective complaints, where Plaintiff was found to be less than credible. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (the ALJ properly discounted opinions that were based "solely from [the claimant's] reporting of her symptoms and her conditions.").

To the extent Plaintiff argues that Ms. Hartman's opinion should have held more weight because of its consistency with the opinions of Mr. Matouk and Dr. F. Qadir, such an argument is without merit. Plaintiff points to Mr. Matouk's

20

statement that she "would most likely function adequately only with an effective

management of her pain condition." (R. at 912.)  However, this ignores the portion

of his report that she displayed "intact functioning," GAF assessment of 68[4], and a

"good" prognosis." (Id.)  In addition, Plaintiff mentions Dr. Qadir's notation that

her symptoms of anxiety and depression were "contingent with her medical

symptoms and [could] cause problems working . . ." and his GAF assessment of

46.[5]  (R. at 1146.)  This ignores the part of his opinion that assessed only mild to

moderate work-related mental restrictions.  (R. at 1147.)  Additionally, the Sixth

Circuit has held that a "GAF in the high 40s to mid 50s . . . would not preclude [the

claimant] from having the mental capacity to hold at least some jobs in the national

---

[4] The GAF scale was used to report a clinician's judgment of an individual's
overall level of functioning.  Clinicians selected a specific GAF score within the
ten-point range by evaluating whether the individual was functioning at the higher
or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association,
4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 61-70 was indicative of
"mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in
social, occupational, or school functioning (e.g., occasional truancy, or theft within
the household), but generally functioning pretty well, has some meaningful
interpersonal relationships." DSM-IV-TR at 34.  However, "the most recent
version of the DSM does not include a GAF rating for assessment of mental
disorders."  *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277,
at *10 (E.D. Mich. Mar. 28, 2014).

[5] A GAF score of 41-50 was indicative of serious symptoms (e.g., suicidal
ideation, severe obsession rituals, frequent shoplifting) or any serious impairment
in social, occupational, or school functioning (e.g., no friends, unable to keep a
job).

economy." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

Furthermore, the ALJ is not required to reconcile every piece of evidence in the

record, so long as his or her opinion is supported by substantial evidence.

Plaintiff has failed to demonstrate that the limitations opined by Mr. Matouk

and Dr. Qadir are more stringent than those assessed in the ALJ's RFC.

Additionally, she does not argue that the ALJ's stated reasons to discount Ms.

Hartman's opinion were incorrect.  Accordingly, Plaintiff has failed to demonstrate

that the ALJ erred in his analysis or that his analysis is not supported by substantial

evidence.

### b.      Treating Neurologist Dr. Biondo

Here, the ALJ assigned significant weight to Dr. Biondo's opinion, but

declined to adopt the portion that limited Plaintiff to only occasional use of hands

for reaching and handling.  (R. at 24.)  Plaintiff makes the following argument (in

its entirety) with respect to the ALJ's weighing of Dr. Biondo's opinion: "The ALJ

failed to consider all the relevant medical and give proper weight to the

longitudinal treatment of Dr. Biondo."  (DE 12 at 5.)  In her response, Defendant

asserts that Plaintiff has waived her argument with respect to Dr. Biondo's opinion

because she does not explain why or how the ALJ failed to weigh or consider this

evidence.  Plaintiff does not address this issue in her reply brief.

I conclude that Plaintiff has waived her argument with respect to the weight assigned to Dr. Biondo's opinion. The Sixth Circuit explains that "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPhereson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Here, Plaintiff merely recites the facts of the case, asserts that there was some error with respect to Dr. Biondo's opinion, and leaves it to the Court (and opposing counsel) to develop her argument. This is insufficient and her argument, such as it is, should be deemed waived.

### 3.    RFC

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence. 20 C.F.R. §§ 404.1527(3), 416.927(e). "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of*

*Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8-, 1996 WL 374184, at *6-7.

Here, Plaintiff makes an extraordinarily vague and cursory argument that the ALJ erred by failing to find that she would be off task for more than three days per month due to her symptoms and the side effects of her medications. However, her argument consists of her own subjective reports of pain, which the ALJ found to be less than credible.[6] She does not point to any objective evidence in the record to demonstrate that she is more limited than the ALJ opined. *See Newsome v. Sullivan*, 897 F.2d 529, at *2 (6th Cir. 1990) (in weighing contradictory unsupported subjective statements of pain, the objective evidence is controlling).

_____

[6] As addressed below, the ALJ's credibility analysis is supported by substantial evidence.

Although she notes that she "suffers from a constellation of symptoms, which elude objective testing," the ALJ pointed to evidence that most of her physical examinations were unremarkable, that her symptoms were controlled with medication, and she did not suffer from neuropathy.  (R. at 24-25, *see, e.g.,* 842, 886-87, 991-92, 1119.)  Furthermore, as Defendant addresses, the opinion evidence on with Plaintiff relies to support her proposition do not indicate that Plaintiff will be "off task" for more than three days per month.  (*See* R. at 964-966, 1067-1072.) Accordingly, Plaintiff has failed to demonstrate that the ALJ erred in his RFC assessment.

### 4.    Credibility

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.").  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 469, 475 (6th Cir. 2007).

Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 56.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration,

frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  (R. at 23.)  Plaintiff contends that this analysis was in error for two reasons.

First, Plaintiff asserts that the ALJ improperly relied on an attending

doctor's note that implied Plaintiff was feigning her facial droop.  (Id.)

Specifically, the doctor noted the following:

> It is to be mentioned that while entering the patient's room, her face
> was symmetrical without evidence of facial weakness.   However
> when [the] patient noticed that we were in the room, her left facial
> droop returned.

(R. at 637.)  The report further goes on to indicate that her MRI was unremarkable.

Plaintiff argues that there is objective evidence in the record demonstrating the

existence of her facial droop, including a September 26, 2011 EMG result.  (R. at

1246.)  However, as Defendant correctly notes, the ALJ did not indicate that

Plaintiff *never* experienced a facial droop; instead, he noted that the behavior

described by the attending physician, calls her *credibility* into doubt.  Plaintiff does

not point to any law or regulation indicating that an ALJ may not use evidence

from the record in which the claimant was observed by her medical practitioners to

be less than credible when completing his own credibility analysis.

Second, Plaintiff disagrees with the ALJ's mention that "notes dated as

recent[ly] as September 2012 reveal the claimant was still volunteering at a dog

rescue."  (R. at 24 n. 2.)  Plaintiff asserts that her volunteer work "does not transfer

into [substantial gainful activity ("SGA")] as opined by the ALJ.  However, the

ALJ was not evaluating Plaintiff's volunteer work to determine if she engaged in

SGA during the relevant time period.  In fact, he concluded that Plaintiff had *not*

engaged in SGA since her alleged onset date.  Instead, the ALJ was comparing

Plaintiff's testimony of disabling conditions with the seemingly contradictory fact

that she was engaged in volunteer work at a dog rescue during the same period.

The ALJ is entitled to weigh conflicting testimony when making his or her

credibility assessment.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, No. 13-cv-14106,

2015 WL 574910, at *5 (E.D. Mich. Feb. 11, 2015).  Plaintiff has not demonstrated

an error in this respect.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes

that substantial evidence supports the ALJ's decision denying benefits.

Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for

summary judgment, **GRANT** Defendant's motion for summary judgment, and

**AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 5, 2016          s/Anthony P. Patti
                               Anthony P. Patti
                               UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 5, 2016, electronically and/or by U.S. Mail.

                               s/Michael Williams
                               Case Manager for the
                               Honorable Anthony P. Patti

30